IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 93-8074

---

WESTERN NATIONAL BANK,

Plaintiff,

versus

UNITED STATES, ET AL.,

Defendants,

UNITED STATES,

Defendant-Appellee,

versus

COMPTROLLER OF PUBLIC ACCOUNTS
FOR THE STATE OF TEXAS,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

(    November 19, 1993  )

Before WISDOM, HIGGINBOTHAM, and SMITH, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The United States and the State of Texas both claim the same bank account to satisfy tax liabilities. We affirm the district court's grant of summary judgment for the federal government, persuaded that the federal lien attached to the account before the state's claim arose.

This case stems from a secured transaction among oil companies. In August 1991, 3-B Rattlesnake Refining Limited and 3-B Rattlesnake Refining Corporation executed a UCC-1 financing statement in favor of Enron Oil Trading and Transportation Company, which was filed with the state on August 12, 1991.[1] The parties then renegotiated the agreement on November 21, 1991, to create a "lockbox" deposit account arrangement with Western National Bank.

Under the lockbox arrangement, 3B opened a demand deposit account in its name at Western, for which the only signatories were two Enron employees. 3B's invoices told its customers to make their checks payable to 3B and to mail payment, addressed to 3B, to a post office box maintained by Western. Western forwarded undepositable checks, such as checks without signatures or checks with incorrect endorsements, to 3B for disposition. Additionally, 3B forwarded checks mistakenly sent to 3B's offices to Western for deposit in the account. Neither 3B nor Enron could unilaterally terminate the agreement. If a customer was late in making a payment to the lockbox, 3B could take it to court.

In late 1991, creditors began vying for 3B's assets. The IRS assessed federal excise taxes against 3B on September 16 and December 23, 1991, and March 23 and May 21, 1992. The IRS recorded

_____

[1]It covered: "All furniture, supplies, machinery, inventory and nonfixture equipment and personal property now or hereafter located on any of the land described in Exhibit A, attached hereto and made a part thereof for all purposes, and/or used in connection with any present or future building(s) or other improvement(s) upon any of the said lands, excluding the platinum catalyst in the reformer."

a notice of federal tax lien on 3B's property in the appropriate county property records on April 22 and 23, 1992, and then filed with the Texas Secretary of State on May 8, 1992. The IRS filed notice of later assessments with the county on June 22 and with the Secretary of State on June 25. Meanwhile, the Texas Comptroller of Public Accounts filed notices of motor fuels taxes on May 11, 1992. It served "freeze" notices on Western on May 22 for a total of $205,011.59, the balance of fuels taxes then due the state. On that day the account had about $1.7 million on deposit.

Later that month, 3B and Enron settled litigation arising out of their business dealings. As part of the settlement, Enron waived any lien it had on the lockbox account, and 3B became immediately entitled to collect all the money in the account. Enron then released the account leaving only the $205,011.59 claimed by the state on deposit on May 26, 1992.

On June 4, the IRS served a notice of levy on Western stating it had assessed a total of $1,932,221.13 against 3B. Faced with conflicting claims to the same account, the bank filed an interpleader action in July 1992 in state court and the IRS removed to federal court. Both sides moved for summary judgment and in January of 1993 the district court ruled for the IRS.

## II.

The accounts receivable generated by 3B's sales to customers created rights under state law that constituted "property" under the Internal Revenue Code. See, e.g., United States v. Bank of Celina, 721 F.2d 163, 167 (6th Cir. 1983). A federal tax lien

3

attached to this property on September 16, 1991, when the IRS made its first assessment against 3B.[2]  See 26 U.S.C. § 6322.  That property remained subject to the IRS lien after the negotiation of the lockbox arrangement with Enron.  See United States v. Bess, 357 U.S. 51, 57 (1958) ("[I]t is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere.").

Once a tax lien attaches, the question of its priority against other liens is determined by the rule that "the first in time is the first in right."  To defeat the federal lien under these circumstances, the competing state lien must have been "perfected" before the federal lien was assessed on September 16, which means that the identity of the lienor, the property subject to the lien, and the amount of the lien must have been established before September 16.  United States v. McDermott, 113 S.Ct. 1526, 1528 (1993); United States v. New Britain, 347 U.S. 81, 86 (1954).  Since no evidence in the record shows the existence of a state claim prior to the notices filed on May 11, 1992, the federal lien has priority.

The state contends that Enron had a prior-perfected security interest in those accounts receivable.  As a result, the state argues, the IRS lien was "not . . . valid" since the IRS did not file public notice about its lien until almost a year after Enron entered the arrangement.  See 26 U.S.C. § 6323(a).  This contention

_____

[2]As the first lien involved an assessment of $235,145.91, more money than the account held when the levy was served, we do not analyze the strength of the other liens.

4

fails for two reasons. First, section 6323(a) governs lien priority in a dispute with a secured creditor; it does not address the creation or elements of a lien. The lien existed even if Enron had priority over the IRS for a period of time. Second, Enron had no such priority when the IRS levied, as Enron released all of its interest in the account in favor of 3B on June 1, three days before the levy.

The state next contends that its claim enjoys the "superpriority" status of 26 U.S.C. § 6323. Section 6323 provides that a lien is not valid against the purchaser of a security who lacked actual knowledge of the lien at the time of purchase. 26 U.S.C. § 6323(b)(1)(A). The state contends that since "money" is a security, it qualified as a purchaser of a security by serving a freeze notice on the bank. See 26 U.S.C. § 6323(h)(4).

This argument, inventive as it is, has two flaws. First, Texas is not a purchaser. A "purchaser" is one who for adequate and full consideration acquires an interest in property. 26 U.S.C. § 6323(h)(6). We see no exchange of consideration in the collection of tax revenue. Further, Congress has established a superpriority for real property tax and special assessment liens. 26 U.S.C. § 6323(b)(6). The decision to go further and establish another superpriority for state fuel taxes is a decision for Congress rather than this court. See William T. Plumb, Jr., Federal Liens and Priorities—Agenda for the Next Decade III, 77 Yale L.J. 1104, 1108 (1968) (noting that "[f]urther study might lead to the conclusion that additional superpriorities may deserve

5

federal recognition" in the area of "sales, gasoline, and other taxes collected from the consumer").

Lacking a foundation for a superpriority in federal law, the state next seeks one in Texas law. It cites a Texas statute requiring the collectors of fuels taxes to hold them in trust for the state. Tex. Tax Code Ann. § 111.016 (Vernon 1992). See also Dixon v. State, 808 S.W.2d 721, 723 (Tex. App.-Austin 1991, writ dism'd w.o.j.). It argues that the IRS lien could not attach to funds in the lockbox account collected to pay fuel taxes, as those funds were being held in trust for the state. See Aquilino v. United States, 363 U.S. 509, 515 (1960).

Congress has not given state sales taxes the superpriority under the Internal Revenue Code enjoyed by state property taxes, and we are not persuaded that the Texas legislature has either. However the state characterizes its claim for sales taxes, the first-in-time rule determines the priority of conflicting state and federal claims for taxes when a section 6323 provision does not apply. See United States v. Vermont, 377 U.S. 351, 358-59 (1964); In re Thriftway Auto Rental Corp. v. Herzog, 457 F.2d 409, 413 (2d Cir. 1972) (both looking to the New Britain test to determine priority of conflicting liens rather than state or local lien characterization). See also Michael I. Saltzman, IRS Practice and Procedure ¶ 16.04[2][f], at 16-35 (2d ed. 1991) ("Obviously, significant state and local taxes, such as state and local . . . sales taxes, are not covered by the [§ 6323(b)(6)] superpriority. Liens for these taxes, even if the lien has arisen before the

6

federal tax lien, must qualify as `choate' liens . . . .").
Assuming that Enron acted as a collector of fuels taxes, triggering
the Texas statute, the federal claim has priority because Texas's
equitable interest did not arise until after the IRS asserted its
interest by assessing 3B on September 16, 1991.  See State v. Bar
Coat Blacktop, Inc., 640 F.Supp. 407, 411-12, 415-16 (W.D. Wisc.
1986) (federal tax lien had priority over later-arising state's
equitable lien for tax liability).

The state directs us to bankruptcy law to support its trust
fund argument.  The cases it cites address various threshold
questions under bankruptcy law, such as the dischargeability of a
state claim for fuel taxes or whether money collected for payment
of fuel taxes falls within the debtor's estate.  See, e.g., Matter
of Al Copeland Enterprises, 991 F.2d 233, 235 (5th Cir. 1993); In
re Avant, 110 B.R. 264, 265 (Bankr. W.D. Tex. 1989).  The inquiry
in this case takes place a step later, after the court has
identified the nature of the state's claim, and asks about the
priority of that claim relative to a federal one.  The state cites
no bankruptcy cases speaking to that separate issue.

AFFIRMED.